Durfee, Judge,
delivered the opinion of the court:
This is an action for refund of income taxes. Plaintiff bank was in business for many years, but on May 20, 1958, was placed in voluntary liquidation and assigned all its assets to the American Security and Trust Company, which assumed all its liabilities. During subsequent liquidation, the affairs of plaintiff were in the hands of a Liquidating Committee. Plaintiff itself did no banking business after May 20,1958.
In August, 1958 the District of Columbia assessed plaintiff for gross receipts tax in the amount of $49,428.68 for the period July 1, 1957 through May 20, 1958, which was the *619 day that plaintiff went out of 'business. The payment of the District of Columbia gross receipts tax was actually made by check drawn by the American Security and Trust Company on August 7, 1958. Section 162 of the Internal Revenue Code of 1954, 26 U.S.C. § 162 (1958 ed.) permits the deduction of “ * * * all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * Defendant contends that plaintiff bank cannot initially establish that it, not its successor, paid or incurred the expense which it claims is deductible; that taxpayer ceased to exist for tax purposes on May 20, 1958, and could not file a tax return or sustain a net operating loss thereafter for a carryback to 1956.
Plaintiff is entitled to claim a deduction somewhere for the payment of the tax of $49,428.68 to the District of Columbia for its gross receipts for the period July 1, 1957 through May 20, 1958, when plaintiff went out of the banking business. Although plaintiff bank agreed to then assign all of its property and assets to the American Security and Trust Company on May 20,1958, plaintiff did not thereafter become a mere corporate “shell,” or cease to exist as alleged by defendant. On that same day, the shareholders of plaintiff bank voted to place it in voluntary liquidation under the provisions of §§ 5220 and 5221 of the United States Revised Statutes, 12 U.S.C. §§ 181, 182 (1958 ed.) to take effect at 5 p.m. on May 20, 1958. Three persons were, by the same action, appointed a liquidating committee of the bank with full authority to act for the bank in all matters during liquidation. Upon due notice to the Comptroller of the Currency of this action, the Comptroller replied that he intended on May 21, 1958, to report National Metropolitan in voluntary liquidation as of 5 p.m., May 20, 1958. The Liquidating Committee continued to act until June 9, 1959, when it filed its final report with the Comptroller of the Currency. Until that time, plaintiff bank continued in legal existence at least for tax purposes. It was neither insolvent nor in the hands of a receiver and was capable of suing and being sued for the purpose of winding up its business until its affairs were completely settled. National Bank v. Insurance Company, 104 U.S. 54 (1881); Chemical National Bank v. Hartford *620 Deposit Company 161 U.S. 1 (1896); Rosenblatt v. Johnston, 104 U.S. 462 (1881).
The Treasury Begulations concerning deductibility of taxes provide:
§ 1.164 — 1. Deduction for taxes.— * * * taxes imposed by the United States * * * or a political subdivision [thereof] * * * are deductible from gross income for the taxable year in which paid or accrued, according to the method of accounting used in computing taxable income. * * * In general, taxes are deductible only by the person upon whom they are imposed. * * *
When the gross receipts tax was imposed upon plaintiff bank by the District of Columbia it was no longer in the banking business, but it was still a legal entity against whom the District could have proceeded to enforce collection of the tax which was assessed against the bank after it went into liquidation. The primary obligation for payment of the tax to the District remained upon plaintiff as long as it continued in legal existence. Although the American Security and Trust Company had agreed to assume all of plaintiff bank’s debts, liabilities and obligations, its payment of this tax was made for and on behalf of plaintiff bank. Defendant relies mainly on Citizens National Trust & Savings Bank of Los Angeles v. Welch, 119 F. 2d 717 (9th Cir. 1941), but in that case the action was brought by the assignee national bank; the items claimed had been disallowed as deductions in computing the net income of the assignor state bank, but had been allowed for the assignee national bank. There is nothing here before us to indicate that the assignee American Security has ever claimed or received the benefits of this tax deduction. The court, in the above cited case, in rejecting the contention that plaintiff assignee national bank paid the items as the agent of the assignor state bank, noted that the state bank did no business after the consolidation and concluded at page 719, “* * * Obviously a bank which is doing no business cannot be doing business by or through an agent.” This statement is not applicable to the facts in our case. Plaintiff bank was not doing business as a bank, but its legal entity continued as long as it continued in liquidation.
Under the agreements for purchase of assets and assump *621 tion of liabilities 'between plaintiff bank and American Security, plaintiff bank agreed that immediately after the closing date of May 20,1958, when it would cease doing business as a bank, “* * * it will proceed to complete its liquidation by distributing its assets and thereupon dissolve.” [Emphasis supplied.]
Section 6012 of the 1954 Code, 26 U.S.C. § 6012 (1958 ed.) is entitled “Persons required to make returns of income,” and subsection (b)(3) thereof provides:
(3) Receivers, trustees and assignees for corporations.
In a case where a receiver, trustee in bankruptcy, or assignee, by order of a court of competent jurisdiction, by operation of law or otherwise, has possession of or holds title to all or substantially all the property or business of a corporation, whether or not such property or business is being operated, such receiver, trustee, or as-signee shall make the return of income for such corporation in the same manner and form as corporations are required to make such returns.
Defendant concedes in its brief that this section “requires that the existence of a liquidating corporation be continued for federal tax purposes on the same basis and in the same manner as in the past, as long as the corporation’s affairs are being settled and its assets are not actually distributed to the shareholders of the corporation.” We accept this construction of the statute, but we do not accept the distinction attempted by defendant in arguing that plaintiff bank on May 20, 1958, became a corporation de facto dissolved. Plaintiff bank remained in the process of liquidation until the filing of the final report of its Liquidating Committee on June 9, 1959, effective as of May 29, 1959. Accordingly, we find that the payment of plaintiff’s District of Columbia 1958 tax by American Security on August 7,1958 was for and in behalf of plaintiff, which remained in legal existence for tax purposes during 1958 and until its liquidation had been completed.
We turn now to the actual merits of the claim before us. On August 14, 1958, National Metropolitan filed a Federal income tax return for the period January 1 through May 20, 1958, and claimed the tax payment of $49,428.68 to the Dis *622 trict of Columbia as a deduction. By an appropriate statutory notice of deficiency, the Commissioner of Internal Revenue determined that this deduction should be disallowed. National Metropolitan challenged the correctness of this determination by petition to the Tax Court of the United States, where the case is still pending.
Later, on or about June 14, 1960, National Metropolitan filed another Federal income tax return claiming the same deduction of $49,428.68 for gross receipts tax paid to the District of Columbia as that claimed in the return filed on August 14,1958, which is before the Tax Court. However, the June 1960 return was for the period' May 21 through December, 1958 with no gross income reported because plaintiff was not in the banking business during that period.
National Metropolitan then, about June 15, 1960, filed a claim for refund' of income taxes paid for the year 1956. The claim as finally revised was in the sum of $25,702.21, based upon the deduction of a carryback to 1956 of the net operating loss sustained by National Metropolitan for the period May 21 through December 31, 1958. Upon denial of this claim for refund, National Metropolitan brought this action.
During the years prior to 1958, National Metropolitan used the cash receipts and disbursements method of accounting and filed its tax returns on a calendar year basis.
Clearly, the taxpayer has filed two alternative and inconsistent 1958 Federal income tax returns, the first for the period January 1 to May 20, 1958, when it went out of business, and the second, for the period May 21, 1958, through December 31,1968, when the liquidation of its affairs was in the hands of the Liquidating Committee, and its assets, liabilities and business had been assigned to the American Security and Trust Company. Both returns claim the same deduction of $49,428.68 by reason of the payment by plaintiff to the District of Columbia on August 7, 1958, for gross receipts taxes.
In the Tax Court, plaintiff has an action pending to challenge the determination by the Commissioner of Internal Revenue that the deduction claimed in the first return should *623 be disallowed. In this action, defendant in its Response to Plaintiff’s Post-Argument Memorandum, states that although briefs have not yet been filed:
“* * * it is our understanding that the Commissioner of Internal Revenue will defend that action on the same grounds as set forth in the Government’s brief herein: vis., that a cash basis taxpayer may not deduct an expense which it does not pay * * *, and which was not in fact paid until after it had ceased to exist for tax purposes * * *. In addition to those contentions, we also noted in our brief * * * that even if taxpayer could here establish that it is entitled to the deduction claimed, it still could not be granted the relief sought; a refund of tax* * *”
In this court, plaintiff sues for refund based upon the same deduction, but would apply the deduction not on the computation of its 1958 taxes, but as a carryback to net operating losses sustained in 1956. Defendant maintains that the second return, filed for the latter period of 1958, was then a nullity because plaintiff bank was de facto dissolved and liquidated on May 20, 1958, and therefore “it correctly filed its final return for the[1] short 'period'’ to and including May 20, 1958" Thereafter, defendant contends, plaintiff could not realize taxable income or pay deductible expenses.
In the Tax Court, the National Metropolitan Bank opposes the contention of the Commissioner that the District of Columbia tax of $49,428.68 is not deductible for the period January 1 through May 20,1958. However, plaintiff here in its Post-Argument Memorandum concedes that it cannot deduct the District of Columbia tax twice, and that if it prevails here in this court, it will accept the Government’s position in the Tax Court. Plaintiff also concedes that if it prevails in the Tax Court, it would consent to a dismissal in the present case, but that this occasion has not arisen and therefore, economy of judicial effort would be ill-served by postponing decision of this case until after decision of the Tax Court case.
It would appear that neither party has, up to now, evinced much concern about economy of judicial effort. We are confronted with two variations of the old “Shell Game,” *624 where a dried pea is placed under one of two walnut shells by the prestidigitator and the hapless victim is asked to determine which shell covers the pea. The variations here are that, whereas plaintiff says that the pea must be under one shell or the other, defendant says that there is no pea, and even if there is, it is not under either shell.
Although plaintiff has the legal capacity and right to sue on its claim, we conclude that it is not entitled to recover in this court. Plaintiff has no legal right to split a tax return for its calendar year 1958 into two returns, one from January 1 to May 20, and the second for the period May 20 through December 31, 1958, and claim the same deduction in each return for a single payment of District of Columbia gross revenue taxes. Obviously, plaintiff has only one legal claim for this deduction as a basis for action in one court. It cannot, by filing two returns containing the same deduction, claim a 1958 tax credit in the Tax Court and a 1958 loss carryback to 1956 in this court.
Plaintiff used the cash receipts and disbursements method in keeping its books, and adopted the calendar year as the taxpayer in filing its tax returns, except for the year 1958 when it filed the two different returns for the two separate periods. The claim before us is based upon a carryback to 1956 of a loss for the period May 20,1958 through December 31,1958. The return for this period stated the payment, during this period, of the District of Columbia gross receipts tax as a deduction. Since plaintiff bank was out of business during this period and reported no income for May 20 through December 31, 1958, plaintiff claims the loss carry-back to 1956 for this period. However, we are unable to make any determination as to whether taxpayer sustained a net operating loss for the calendar year by virtue of the deduction claimed for the second period May 20 through December 31, 1958, without first ascertaining what net income taxpayer realized between January 1 and May 20,1958, and there is nothing in the record before us to supply that information.
Section 441 of the Internal Revenue Code of 1954, 26 U.S.C. § 441 (1958 ed.) requires that taxable income be com *625 puted on the basis of the taxpayer’s taxable year (in this case the calendar year) unless under § 443 of the Internal Revenue Code of 1954, 26 U.S.C. § 443 (1958 ed.) the taxpayer is not in existence for the entire taxable year, when taxpayer can file a return for a period of less than six months. By the very same conclusion we have reached that plaintiff bank was authorized to sue because it continued in legal existence during liquidation for the year 1958, we must also conclude that plaintiff bank was not authorized to file the short period return for the period May 20, 1958, through December 31, 1958. The general rule for the taxable year of deduction is stated in § 441 of the Internal Revenue Code and provides that the amount of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income. In this case, the taxable year was the calendar year 1958, since plaintiff bank remained in legal existence during the process of liquidation and dissolution from May 20 through December 31st of that year and beyond.
Section 6512(a) of the 1954 Code, 26 U.S.C. § 6512(a) (1958 ed.) provides that if a taxpayer files a petition with the Tax Court, no credit or refund of income tax for the same taxable year shall be allowed or made and no suit by the taxpayer may be maintained in any other court.[1]
Defendant has argued that even assuming that taxpayer did pay its District of Columbia gross receipts tax, and did remain in existence for tax purposes beyond May 20, 1958, “only the Tax Court could treat the ‘short period’ return as filed for the entire calendar year and adjust taxpayer’s *626 deficiency accordingly.” We have reached the same conclusion because we have first determined, as essential to this ultimate finding, that plaintiff bank did pay its District of Columbia gross receipts tax and did remain in existence for tax purposes beyond May 20, 1958. Plaintiff has shown no basis upon which it can be granted a tax refund for the year 1956 based upon a loss carryback from 1958.
Plaintiff’s petition is dismissed and judgment is entered accordingly.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen,* and the briefs and argument of counsel, makes findings of fact as follows:
1. In this action for refund of income taxes, plaintiff claims that it is entitled to an adjustment of its tax liability for the calendar year 1956 by allowance of a deduction for a carryback of a net operating loss of $76,428.68 alleged to have been sustained in the period May 21 through December 31, 1958. Plaintiff further alleges that the claimed loss of $76,428.68 is comprised of two items: $49,428.68 paid in August 1958 for taxes assessed by the District of Columbia for taxes upon the gross receipts of banks, and $27,000 for plaintiff’s liability to its employees for bonuses in the period January 1 through May 20, 1958. At a pretrial conference, plaintiff withdrew and abandoned its claim with respect to the payment of bonuses to its employees, thereby reducing the total amount of its claim to $25,702.21.
2. The plaintiff herein, the National Metropolitan Bank of Washington (herein called National Metropolitan), a corporation and a national banking association, was organized under the laws of the United States and carried on the banking business in the District of Columbia for many years, and through, but not after, May 20, 1958. At the time of the filing of the petition herein, and since, National Metropolitan’s address was and it now is, care of Thomas D. Carson, Joseph L. Whyte, and Chester B. Sellner, Liquidating Committee, care of American Security and Trust Company (herein called American Security), 15th Street and Pennsylvania Avenue, N.W., Washington 13, D.C.
*627 3. American Security, a corporation, was originally chartered under the laws of the Commonwealth of Virginia in 1889, and was reincorporated under the banking laws of the District of Columbia in 1890. At all times material herein, American Security has carried on banking business in the District of Columbia.
4. American Security Corporation (herein called the Affiliate), a corporation, was organized in 1957, under the District of Columbia Business Corporation Act. The stockholders of American Security hold the stock of the Affiliate, in the same proportions, and for certain purposes the Affiliate is “affiliated” with American Security. At all times material herein, the Affiliate has carried on general business operations in the District of Columbia, primarily in the financial, but non-banking, field.
5. On April 9, 1958, National Metropolitan, American Security, and the Affiliate duly executed a certain agreement, entitled “Basic Memorandum Agreement,” which envisaged—
(a) An offer by the Affiliate to purchase all of the 75,000 outstanding shares of the stock of National Metropolitan at a net price of $80 per share to National Metropolitan’s shareholders;
(b) The acquisition by the Affiliate of at least 50,000 shares of the stock of National Metropolitan;
(c) An agreement between American Security and National Metropolitan pursuant to which American Security would purchase all the assets of National Metropolitan for $6,000,000, and assume all the liabilities of National Metropolitan; and
(d) The adoption by the shareholders of National Metropolitan of a plan of liquidation.
6. AJso on April 9, 1958, the Affiliate duly made the offer referred to in finding 5, above.
7. On April 16, 1958, the Comptroller of the Currency duly gave his consent to the proposed purchase of assets and assumption of liabilities.
8. On May 7,1958, National Metropolitan as “Seller,” and American Security as “Purchaser,” duly executed a certain agreement, known and herein designated as the “Purchase *628 and Assumption Agreement.” Said Purchase and Assumption Agreement recited, in part here pertinent, as follows:
whereas, Seller intends to cease the transaction of the business for which it was organized and thereafter proceed with the voluntary liquidation of its assets, and dissolution; and
whereas, upon obtaining the requisite approval to this contemplated action by the shareholders of Seller, Seller will dispose of all of its assets and will provide for the payment of all of its outstanding obligations and liabilities and will distribute the overplus to its shareholders ; and
whereas, Purchaser is willing to enter into an agreement with Seller to assume and agree to pay and discharge the deposit and all of the other obligations and liabilities of Seller (other than its liability to its shareholders as such), and to purchase all of the assets of Seller for a price which will give to each shareholder of Seller $80.00 for each share held; and
whereas, pursuant to a certain Basic Memorandum Agreement entered into between Seller, Purchaser and American seouritt corporation on April 9,1958, Seller and Purchaser agreed to execute this Agreement as promptly as possible provided only that certain conditions specified in said Basic Memorandum Agreement were first duly fulfilled;
Said Purchase and Assumption Agreement further provided, in part here pertinent, as follows:
pirst : On the closing date, Purchaser hereby assumes, and agrees to pay and discharge as and when due and payable, the deposit and all other liabilities and obligations of Seller as such liabilities and obligations may exist (other than its liability to its shareholders as such).
second : On the closing date, Seller agrees to sell and transfer, and Purchaser agrees to purchase, all of the assets of Seller of every kind and nature whatsoever, real, personal or mixed, tangible or intangible, for a total price equal to the amount of the deposit and other liabilities and obligations of Seller assumed by Purchaser, plus $6,000,000.
third: On the closing date, Purchaser will pay the purchase price of the assets of Seller to be purchased by it as aforesaid by offsetting against such purchase price the total amount of deposit and other obligations and liabilities of Seller assumed by it, and by paying the *629 balance of $6,000,000 in cash or by cashier’s check of Purchaser.
fourth: On or as of the closing date Seller will:
1. Deliver to Purchaser such of the assets purchased as shall be capable of physical delivery;
2. Execute, acknowledge and deliver to Purchaser all such endorsements, assignments, bills of sale, deeds and other instruments of conveyance, assignment and transfer as shall be reasonably necessary or advisable, in the opinion of counsel for Purchaser, to consummate the sale and transfer of the purchased assets to Purchaser;
3. If requested by Purchaser, assign and deliver by proper endorsement, any and all insurance policies, whether fire, life, fidelity or otherwise, previously taken out by Seller for its own protection so that Purchaser, after the closing date, may be protected to the satisfaction of its counsel;
4. Assign and deliver to Purchaser all real estate leases then in force and all leases and agreements with respect to its safe deposit boxes, which Purchaser agrees to take over and perform;
5. Assign and deliver to Purchaser all collateral security of any nature whatever held by Seller as collateral security for any indebtedness owing to Seller;
6. All books, records and accounts, including tax returns, shall be delivered to and become the property of Purchaser, and will be available at all times to the Liquidating Agents of Seller.
_ fifth : On and after the closing date Seller agrees to give such further assurances and to execute, acknowledge and deliver such bills of sale, deeds, acknowledge-ments and other instruments of conveyance and transfer as in the judgment of Purchaser shall be necessary and appropriate effectively to vest in Purchaser the full legal and equitable title to all assets of Seller, free and clear of all liens and encumbrances. In this connection it is understood and agreed that as of the closing date and to the fullest extent permitted by law the Purchaser shall succeed to the interest of the Seller in the Trust Department of the Seller and all assets pertaining thereto; and that as of that date the.Purchaser shafl become entitled to all Seller’s fees, commissions and other income earned or thereafter earned therefrom and assume all Seller’s existing and future liabilities with respect thereto; and that pending Purchaser or any other person qualifying to succeed Seller in its fiduciary capacity in every necessary case, Purchaser shall, as Sellers’ servant and successor to its business, and to the *630 fullest extent permitted by law, act for Seller in the discharge of Seller’s fiduciary obligations in the premises, and Purchaser agrees to use for such purpose the staff of Seller’s trust department as of the closing date. Seller further agrees to use its best efforts to assist Purchaser to be designated as Fiduciary hi Seller’s place and stead in all cases in which Seller is or expects to be a fiduciary.
sixth : Seller warrants, covenants and agrees that its condition as of the close of business on the closing date will not change materially from its condition as of the dates of this Agreement and the Basic Memorandum Agreement hereinabove referred to and that there are no actions, suits or proceedings pending, or to the knowledge of Seller threatened against or affecting Seller which involve the likelihood of any judgment or liability which may cause any materially adverse change in the business, properties or assets of Seller and that with respect to all mortgages and loans and discounts the amounts due and owing thereon as shown by the books of Seller are correct.
seventh: Purchaser agrees to pay for all expenses and costs in connection with the carrying out of this Agreement and the liquidation and dissolution of Seller, provided, however, that all such expenses and costs shall be approved by Purchaser prior to their being incurred by Seller or by its liquidating committee.
eighth: Seller agrees that immediately after the closing date it will proceed to complete its liquidation by distributing its assets and thereupon dissolve.
ninth : Seller agrees that it will enter into an agreement with a liquidating agent or agents, to be elected by the shareholders providing that such liquidating agent or agents shall receive no compensation for their services in liquidating the assets of Seller, distributing such assets to the shareholders, and proceeding to dissolution.
tenth: The closing date shall be the close of business of the day on which Seller shall cease to do business preparatory to its liquidation and dissolution (i.e., May 20, 1958), such date to be fixed by the shareholders of Seller; provided that such closing date shall be no later than twenty-four hours following favorable action by the shareholders of Seller in approving such liquidation and dissolution.
9. On May 20, 1958, the shareholders of National Metropolitan duly approved the Purchase and Assumption Agreement.
*631 10. Also on May 20, 1958, tbe shareholders of National Metropolitan duly adopted the following resolution:
resolved, That the National Metropolitan Bank of Washington be placed in voluntary liquidation, under the provisions of sections 5220 and 5221 of the United States Revised Statutes (12 U.S.C. 181,182), to take effect 5:00 P.M. (EJD.T.), May 20,1958, and that Thomas D. Carson, Joseph L. Whyte and Frank B. Morgan be appointed liquidating agent or committee of said bank.
Messrs. Carson, Whyte, and Morgan duly took office as the Liquidating Committee of National Metropolitan. Upon the subsequent death of Mr. Morgan, Mr. Chester B. Sellner was appointed to succeed him as a member of such Committee.
11. Also on May 20,1958, the Comptroller of the Currency was duly notified by American Security and National Metropolitan of the action as aforesaid of the stockholders of National Metropolitan, whereupon the Comptroller’s office, on the same date, replied, in effect, that it intended, on May 21, 1958, to report National Metropolitan in voluntary liquidation as of 5:00 P.M. (E.D.T.), May 20,1958.
12. Also on May 20, 1958, National Metropolitan and its Liquidating Committee duly executed, in favor of American Security, a certain Assignment and Undertaking, the text of which read as follows:
The National Metropolitan Bank of Washington, Washington, D.C., does hereby, this twentieth day of May, 1958, transfer, convey, assign and set over unto American Security and Trust Company, absolutely and forever and without condition or limitation whatsoever, all its property and all its right, title and interest in and to. property, tangible and intangible, .real, personal and mixed, of whatsoever nature and description and wheresoever situate, and by these presents does bind itself and its Liquidating Committee promptly to execute and deliver unto American Security and Trust Company, such separate, particular and appropriate deeds, conveyances, assignments, bills of sale, endorsements and other instruments of conveyance, assignment and transfer with respect to particular items of such property and such rights, title and interests in and to property, all in due and proper form? as American Security and Trust Company may from time to time request.
The foregoing transfer, conveyance and assignment and undertaking are made pursuant to, and for and in *632 consideration of a certain agreement dated May 7,1958, by and between this Bank and American Security and Trust Company whereby this Bank agreed to sell and American Security and Trust Company agreed to purchase all of the assets of this Bank for and in consideration of the assumption by American Security and Trust Company of all of the liabilities of this Bank and the payment to this Bank of $6,000,000 in cash, receipt of which is hereby acknowledged. And, by the acceptance of these presents, American Security and Trust Company assumes and promises to pay, as the same shall become due and payable, and to perform, as performance shall be required by their terms, each and every debt, liability and obligation of this Bank, without any limitation or exception whatsoever, and by whatever name called.
Said Assignment and Undertaking was duly accepted by American Security.
13. Also on May 20, 1958, the Board of Directors of National Metropolitan duly adopted a certain resolution which read, in part here pertinent, as follows:
The Liquidating Committee shall serve as such without compensation and is hereby vested with, shall have and shall exercise by majority concurrence, all the powers customarily vested in a liquidating committee 'or agent pursuant to law and the practice of the Comptroller of the Currency with respect thereto; and said Liquidating Committee is hereby expressly authorized and directed to act for and on behalf of this Bank in all matters during the course of its liquidation, including but not limited to the execution and delivery of all papers and documents on behalf of this Bank incident to the transfer and conveyance of all of its assets to American Security and Trust Company pursuant to the purchase and assumption agreement entered into with such Trust Company on May 7, 1958, or otherwise incident to the liquidation of this Bank.
14. On May 20, 1958, the Board of Directors of National Metropolitan duly adopted a further resolution which read, in part here pertinent, as follows:
Since the terms of the purchase and assumption agreement with American Security and Trust Company call for that Company to pay a price which will give each shareholder, on liquidation, $80 for each share held and for such Company to assume all the costs and risks of *633 liquidation, the Liquidating Committee is hereby authorized, in its discretion and subject to any necessary action by the Comptroller of the Currency, to proceed forthwith on May 21, 1958, or at any time thereafter to pay a 100 percent liquidating dividend ($80) or any part or parts thereof; and as an incident thereto such Committee may adopt any reasonable procedures it may deem prudent, including a requirement that no dividend -will be paid except upon surrender and/or endorsement of the certificates for the shares of stock involved and may make appropriate arrangements to the end that a trustee be appointed to receive payments for the benefit of any shareholder where it is not possible or convenient to pay such shareholder directly or his rights or identity is in doubt.
15. Also on May 20, 1958, the Board of Directors of National Metropolitan duly approved a certain statement concerning operations of National Metropolitan in liquidation. Said statement read as follows:
May 20,1958
STATEMENT CONCERNING OPERATIONS OP THE NATIONAL METROPOLITAN BANK OP WASHINGTON IN LIQUIDATION
(1) The placing of this Bank in voluntary liquidation is a prerequisite to the sale of its assets to, and the assumption of all its liabilities by, American Security and Trust Company.
(2) Such action was approved at today’s special meeting of shareholders and, accordingly, this Bank will be in voluntary liquidation as of the close of business today.
(3) That means that commencing as of the opening of business tomorrow (May 21,1958) this Bank as such will cease doing all business except that incident to its liquidation, and on and after such date all regular banking business in our offices will be done as a part of American Security and Trust Company. In short, our regular banking business will be conducted on the basis of this Bank and its branches henceforth being branches of American Security and Trust Company.
(4) As far as regular banking business is concerned this will not result immediately in any substantial change in our methods of operation (except as such changes may be specifically made from time to time). As of May 21, 1958, all officers and employees cease to be officers and employees of this Bank and become officers and employees of American Security and Trust *634 Company, but until further notice their duties and responsibilities will be exactly as heretofore.
(5) The Board of Directors of this Bank will continue to be responsible for the supervision of this Bank during its liquidation. However, as a matter of policy, vacancies created on the Board of Directors during liquidation will not be filled unless the filling of such vacancies is necessary in order to have at least five active members of the Board of Directors. Similarly and unless otherwise determined by the Board, there will be no further regular meetings of the Board of Directors. Instead, matters requiring action by the Board shall be attended to at special meetings thereof which may be called by the Liquidating Committee or at the request of three or more Directors.
(6) Since this Bank will have no officers or employees as such during liquidation, the actual management of the affairs of this Bank during liquidation will be in the hands of a Liquidating Committee comprised of the following:
(a) Thomas D. Carson, tb) Joseph L. Whyte,
(c) Frank B. Morgan.
They will be responsible for all the liquidating activities of this Bank; they will (either personally or by delegates) execute all the necessary legal documents, sign checks, and administer trusts, pending the qualification of new trustees.
(7) To assist them in the performance of their duties some of the staff of this Bank, as officers and employees of American Security and Trust Company, will be designated by the Liquidating Committee to perform certain duties which they will perform as part of their employment by American Security and Trust Company and with no special compensation therefor. Thus :
(a) The Liquidating Committee will designate some if not all of the present staff of our Trust Department to continue to serve in the same capacity for it in the administration of such Department and in arranging, to the extent possible, for the substitution of American Security and Trust Company for this Bank as trustee. _ Such officers and employees, in addition to their titles or designations as officers and employees of American Security and Trust Company will be given working titles (such as Trust Officer or Assistant Trust Officer) of this Bank in liquidation. However, no such working *635 title shall include the title of President, Assistant to the President, Vice President, Cashier, etc.
(b) Checks drawn on the account of this Bank in liquidation need be signed for the Liquidating Committee by any two of the three members of the Committee, but any two members of such Committee may if they deem it desirable, authorize in writing the signing of checks, etc., for the Committee by one or more other persons.
(8) All questions arising concerning the activity of this Bank in liquidation shall be directed to the Liquidating Committee or a member thereof. Such Committee will meet as frequently as may be necessary and it may, if it chooses, elect a Chairman.
Said statement was thereupon duly distributed to each officer of National Metropolitan.
16. On May 21, 1958, the Liquidating Committee by letter to the Federal Eeserve Bank of Bichmond duly requested the cancellation of National Metropolitan’s Federal Eeserve Bank Stock; and by letter to the Federal Deposit Insurance Corporation duly advised it that National Metropolitan had been placed in a status of liquidation as of the close of business on May 20,1958.
17. On May 21, 1958, the Liquidating Committee of National Metropolitan addressed a letter to the shareholders of National Metropolitan which read, in part here pertinent, as follows:
The shareholders of this bank on May 20,1958, voted to place it in voluntary liquidation and approved the sale of its assets to, and the assumption of its liabilities by, American Security and Trust Company. Such latter bank has now paid this bank the purchase price of $6,000,000, which is now available for distribution as a final liquidating dividend of $80 per share of National Metropolitan stock.
Accordingly, you are hereby requested to bring your certificates of stock to this office or send them to us by registered mail in the enclosed envelope. Promptly upon the receipt thereof we will mail you a check for $80 per share payable to the order of the shareholder of record of such shares.
On said date, substantially all of the $6,000,000 referred to in said letter was distributed to the shareholders of National Metropolitan.
*636 18. On January 16, 1959, the Liquidating Committee of National Metropolitan filed a report with the Comptroller of the Currency entitled “Report of Progress of Liquidation” as of December 31,1958. The report indicated that:
(a) Effective September 24, 1958, Mr. Chester _ B. Sellner was appointed a member of the Liquidating Committee of National Metropolitan, to succeed Mr. Frank B. Morgan.
■(b) All creditor claims, including all additional claims asserted during the period of advertisement for claims, had been fully paid or assumed by an operating bank.
(c) As of December 31, 1958, two shareholders of National Metropolitan, owning between them 133 shares, with respect to which the amount of $10,640.00 remained payable, had not surrendered their shares, and had not received payment therefor.
. (d) At May 20,1958, National Metropolitan had stood in a fiduciary capacity, as trustee, co-trustee, custodian, agent, attorney-in-fact, treasurer, or otherwise, in respect of 497 accounts. During the period May 21, through December 31, 1958, the Liquidating Committee of National Metropolitan effected the transfer, closing, or other disposition of 312 of said fiduciary accounts, as follows:
235 by transfer to American Security pursuant to an amendment of the controlling agreement, a new agreement, or a Court order or decision;
14 by transfer to the Affiliate, pursuant to agreement; and 63 by closing or other disposition.
19. On June 9, 1959, the Liquidating Committee of National Metropolitan filed a final report with the Comptroller of the Currency entitled “Report of Progress of Liquidation” as of May 29, 1959. The final report indicated that :
(a) All shareholders of National Metropolitan had surrendered their shares and had received payment therefor.
(b) During the period January 1 through May 18, 1959, the Liquidating Committee of National Metropolitan effected the transfer, closing, or other disposition of the 185 fiduciary accounts remaining at December 31, 1958, as follows:
151 by transfer to American Security, pursuant to an amendment of the controlling agreement, a new agreement, or a Court order or decision;
*637 1 by transfer to the Affiliate, pursuant to agreement; and
33 by closing or other disposition.
20. With a few minor exceptions not here material, National Metropolitan consistently used the cash receipts and disbursements method of accounting in keeping its books and filing its tax returns. In particular, said method was used in reflecting and reporting District of Columbia gross receipts tax. Except as hereinafter set forth, National Metropolitan’s taxable year was the calendar year.
21. In August 1958, the appropriate authorities of the District of Columbia assessed against National Metropolitan, in respect of the taxable period ended May 20, 1958, gross receipts tax in the amount of $49,428.68. National Metropolitan did not at any time or in any manner protest or contest said assessment. Said amount of $49,428.68 was paid on August 7, 1958, by check drawn by American Security. In evidence as exhibit 20 are two tax bills issued by the office of the Assessor of the District of Columbia to National Metropolitan covering taxes on “Gross Earnings For Period July 1, 1957 thru May 20, 1958 (Final return).” The bill for the first half of the taxes due September 1958 was in the amount of $24,714.34 and the bill for the second half of such taxes due March 1959 was also in the amount of $24,714.34. Each bill bears the stamp of the “D.C. Treasurer” showing that it was paid on August 7,1958.
22. On August 14, 1958, National Metropolitan filed a return for the period January 1 through May 20, 1958, with the District Director of Internal Revenue for the District of Baltimore, Maryland. In the return, National Metropolitan claimed the amount of $49,428.68, referred to in finding 21, as a deduction. By an appropriate statutory notice of deficiency, the Commissioner of Internal Revenue determined that said deduction should be disallowed. National Metropolitan, by petition to the Tax Court of the United States (Docket No. 92778), challenged the correctness of said determination. Said Docket No. 92778 has not been submitted to the Tax Court.
23. Upon being informed that the Commissioner of Internal Revenue proposed to take the action described in the *638 preceding finding, National Metropolitan, on or about June 14, 1960, filed a Federal income tax return for the period May 21 through December 31, 1958. The return, which reported no gross income, claimed certain deductions, including a deduction in the amount of $49,428.68 in respect of the gross receipts tax paid to the District of Columbia.
24. National Metropolitan’s taxable income for the calendar year 1956 was $440,313.81, without adjustment for any carryforward or carryback of any net operating loss sustained in any taxable period prior or subsequent to the calendar year 1956. In respect of said taxable income for the calendar year 1956, there were assessed against National Metropolitan, and National Metropolitan paid, Federal income taxes on the dates and in the amounts as follows: March 14, 1957, $147,106.59, and June 6, 1957, $45,456.59. The taxes paid and collected as aforesaid were covered into the Treasury as Internal Revenue taxes in the usual course of business by the Director of Internal Revenue for the District of Baltimore, Maryland.
25. On or about June 15,1960, National Metropolitan duly filed a claim for refund of income taxes it had paid in respect of the calendar year 1956, in the amount of $39,742.91, said claim being based upon the deduction of a carryback of the net operating loss sustained by National Metropolitan in respect of the period May 21 through December 31, 1958. The claim for refund, which was filed more than 6 months prior to the institution of this action, was tentatively denied by the Commissioner of Internal Revenue, acting for the United States, on April 10, 1961. As previously stated, National Metropolitan has withdrawn and abandoned its claim with respect to the payment of bonuses to its employees, thereby reducing the amount of the claim to $25,702.21.
26. No part of the Federal income taxes paid by National Metropolitan as aforesaid in respect of the calendar year 1956 has been repaid or credited.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and therefore, the petition is dismissed.

 Sec. 6512. Limitations in case of petition to Tax Court.
(a) Effect of petition to Tax Court.
If the Secretary or his delegate has mailed to the taxpayer a notice of deficiency nnder section 6212(a) (relating to deficiencies of income, estate, and gift taxes) and if the taxpayer files a petition with the Tax Court within the time prescribed in section 6213(a), no credit or refund of income tax for the same taxable year, of gift tax for the same calendar year, or of estate tax in respect of the taxable estate of the same decedent, in respect of which the Secretary or his delegate has determined the deficiency shall be allowed or made and no suit by the taxpayer for the recovery of any part of the tax shall be instituted in any court except—
* * * Sjt #
(The exceptions in the statute are not applicable to- the present case.)

 Naw, and at tie time of tie argument of tie ease, Clief Judge Cowen.